IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BRIDGETTE L. FORESYTH | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No. |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| DR. MARK T. ESPER, SECRETARY, | ) | |
| DEPARTMENT OF THE ARMY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S VERIFIED COMPLAINT FOR DAMAGES

NOW COMES the Plaintiff, **BRIDGETTE L. FORESYTH** (hereinafter, the "Plaintiff"), through her undersigned counsel of record, and files this Complaint for Damages against Defendant, **DR. MARK T. ESPER, SECRETARY OF THE DEPARTMENT OF THE ARMY** (hereinafter, referred to as "Defendant") on the following grounds:

## JURISDICTION AND VENUE

### 1.

This action is brought by the Plaintiff for damages against Defendant for discrimination on the bases of race (African-American), sex (female), religion

(Christian), color (brown), and disability (association with Plaintiff's husband chronic mental and physical disabilities) and retaliation for Plaintiff's prior protected EEO activity in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et</u> <u>seq</u>., as amended, and Section 501 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), as amended, 29 U.S.C. § 791 <u>et</u> <u>seq</u>.

**2.**

Plaintiff invokes this honorable Court's federal question jurisdiction pursuant to 42 U.S.C. §§ 2000e-5(f)(1) and (3), and 28 U.S.C. §§ 1331 and 1343.

**3.**

Plaintiff seeks declaratory and injunctive relief, expenses of litigation, including reasonable attorney's fees and costs.

**4.**

Venue is proper in this Court because the Plaintiff resides within the area encompassed by the United States District Court for the Northern District of Georgia, and in particular, the Northern Division of said Court pursuant to 28 U.S.C. § 1391.

## THE PARTIES

### 5.

Plaintiff is a citizen of the United States of America, and presently resides in in Henry County, State of Georgia. Plaintiff submits herself to the jurisdiction of the United States District Court for the Northern District of Georgia for any and all purposes related to or arising from the action within.

### 6.

During all times relevant to this action, Plaintiff was employed with Defendant's Department of Army at Camp Zama in Sagamihara, Zama, Japan (the "Agency").

### 7.

Defendant is the official Agency head of the Department of the Army; and thus, Defendant is subject to the jurisdiction of this Court.

### 8.

Defendant may be properly served with process by sending a copy of the summons and complaint by registered or certified mail to the civil-process clerk at the United States attorney's office for the Northern District of Georgia, the Attorney General of the United States at Washington, D.C., and the head of the Agency.

**9.**

During all times relevant to this action, Defendant met the jurisdictional

prerequisites for a claim under Title VII and the Rehabilitation Act.

**10.**

During the relevant time period, Defendant was an "employer" as defined by

Section 701(b) of Title VII and is thus, covered by, and subject to, the provisions

of Title VII, 42 U.S.C. § 2000e et seq., as amended.

**11.**

Defendant, including its supervising personnel, officials, agents, officers,

and employees were responsible for all acts complained of herein.

**<ins>NATURE OF THE ACTION</ins>**

**12.**

This action arises out of events during Plaintiff's terms and conditions of

employment with Defendant.  Therefore, this action seeks declaratory and

injunctive relief, nominal, compensatory, punitive, and liquidated damages,

backpay with interest and front pay, if applicable, based upon the Defendant's

intentional discriminatory conduct, retaliation, and other unlawful employment

practices under Title VII and the Rehabilitation Act.

## FACTUAL ALLEGATIONS

### 13.

Plaintiff is an African-American, Female, and Christian, who began working for the Agency on or about April 1, 1996, and last held the position of Budget Officer (GS-0560) at U.S. Army Japan ("USARJ") from on or about July 17, 2013 until May 2015 due to a curtailment of her tour in Japan.

### 14.

During the relevant time period of Plaintiff's EEO Complaint, Sandra Haasl ("Haasl"), Deputy Chief of Staff, Resource Manager, U.S. Army Japan (G-8) Directorate, served as Plaintiff's first-level supervisor from on or about February 23, 2014 until May 17, 2014.

### 15.

As Deputy Chief of Staff, Haasl was responsible for the direct supervision of four (4) division chiefs assigned to the G-8 Directorate, including Plaintiff, Cliff Wenzel ("Wenzel") (Caucasian/Male/Christian), Accounting Chief, Dan Hew ("Hew") (Hawaiian/Male/Religion Unknown), Cost Sharing Chief, and Misuza "Missy" Lee ("Lee") (Japanese/Female/Religion Unknown), Chief of Manpower Management.

**16.**

Plaintiff was the only African-American female division chief assigned to the G-8 Directorate.

**17.**

Colonel Kenneth Chase ("COL Chase") (Caucasian/Male/Christian), USARJ Deputy Commander, was Plaintiff's second-line supervisor from on or about August 4, 2013 until September 8, 2014.

**18.**

COL Chase reported directly to Major General Boozer ("Major Boozer") while assigned to USARJ.

**19.**

In September 2014, COL Richard Heyward ("COL Heyward") (Caucasian/Male/Lutheran), who was formerly a G-3 Operations Officer, replaced COL Chase as the Deputy Commander at USARJ.

**20.**

The following charged Agency's officials were aware of Plaintiff's race and sex and acknowledged during the Agency's investigation of Plaintiff's EEO Complaint that Plaintiff's husband appeared to be physically disabled: COL Chase,

COL Heyward, Haasl, and Howard Vickers ("Vickers")

(Caucasian/Male/Catholic), Civilian Personnel Director (GS-0201-14).

## 21.

In fact, COL Chase referred to Plaintiff as "colored" when asked to identify

Plaintiff's color in a sworn declaration obtained by Defendant during the course of

the Agency's investigation into Plaintiff's EEO Complaint.

## 22.

Between February 27, 2014 and March 4, 2014, Haasl commented on

multiple occasions that "some of the women did not know [their] place" within the

organization at USARJ, in the presence of Plaintiff, who believed Haasl was

referring primarily to African-American women in a demeaning way.

## 23.

Plaintiff recalled similar comments made by Haasl referring to employee,

Eris Washington, who is African-American, and the other comment referenced two

(2) African-American employees (Kimberly Lewis and Shelly Johnson) in the

Housing Unit.

**24.**

Plaintiff questioned Haasl about the comments and told her co-worker, Donna Chukwu David ("David") (African-American/Female/Baptist), Budget Analyst, about the biased comments made by Haasl.

**25.**

Although David did not personally witness the biased comments made by Haasl, David stated in her sworn declaration that Haasl's behavior in the workplace presented a race/color issue.

**26.**

On or about March 7, 2014, Haasl told Plaintiff that she was no longer allowed to approve leave, overtime, compensatory time *(i.e.* "comp time") for the budget analysts under Plaintiff's supervision.

**27.**

Yet, Haasl allowed Misuza Lee, Manpower Chief, to approve leave for an intern.

**28.**

On or about March 7, 2014, Haasl informed all division chiefs, including Plaintiff, to start submitting daily bullets of work assignments, but Haasl only criticized Plaintiff if she failed to do so.

**29.**

Cliff Wenzel, who was the Accounting Chief, was not required to send daily bullets to Haasl until after Plaintiff confronted Haasl about singling her out.

**30.**

During the agency's investigation of Plaintiff's EEO complaint, Howard Vickers, Jr., ("Vickers"), who was the Civilian Personnel Director at the time, explained that it was usual for Haasl to direct Plaintiff to submit daily bullets of her work to Haasl unless there was a performance issue, but Vickers noted that Plaintiff's work performance was exemplary.

**31.**

Vickers also stated that Haasl was mean to everyone, but Haasl was especially mean to Plaintiff and picked on Plaintiff because people really liked Plaintiff.

**32.**

In March 2014, Haasl advised all of the division chiefs, including Plaintiff, to refrain from direct communications with high ranking military personnel (06 Colonels and above) insisting they were her peers.

**33.**

However, it appeared that Haasl's directive was only applicable to

Plaintiff's budget division while other divisions continued with business as usual.

**34.**

On or about March 19, 2014, Haasl removed Plaintiff's ability to communicate with principal staff in her command and counterparts at US Army Pacific Command, which prevented Plaintiff from doing her job and led to several suspense deadlines not being met.

**35.**

Prior to March 2014, Plaintiff communicated daily with staff principals regarding budgetary matters.

**36.**

In March 2014, Haasl also questioned Plaintiff about not responding to her emails within minutes after sending the emails and excluded Plaintiff from attending a meeting with COL Chase even though Plaintiff had been previously invited to the meeting.

**37.**

On or about March 19, 2014, Plaintiff felt humiliated by Haasl's actions and met with COL Chase to discuss Haasl's behavior towards her.

**38.**

Plaintiff told COL Chase that Haasl treated her like her personal hired help.

**39.**

During the meeting, COL Chase asked Plaintiff if he could read her a scripture from the Bible.

**40.**

COL Chase retrieved his bible and read the following from Colossians 3:22, "*Slaves, obey your earthly masters in everything; and do it, not only when their eye is on you and to curry their favor, but with sincerity of heart and reverence for the Lord*."

**41.**

Plaintiff was in total disbelief because of the scripture read by COL Chase.

**42.**

During the Agency's investigation of Plaintiff's EEO complaint, COL Chase could not identify any other employees that he had shared similar Bible passages with.

**43.**

After leaving the meeting with COL Chase, on March 19, 2014, Plaintiff asked Haasl if she could take sick leave for the remainder of the day, but Haasl immediately raised her voice at Plaintiff stating, "This is unbelievable, so who do I go to when you're not around?"

**44.**

Plaintiff later complained to Haasl via email that Haasl's behavior was demeaning and inappropriate during the incidents that occurred on March 19, 2014, but Haasl ignored Plaintiff's concerns.

**45.**

When Plaintiff returned to the office, on March 20, 2014, Plaintiff learned that an intern, Aaron Okoro ("Okoro"), who worked in the Budget Division had been reassigned by Haasl to work in the Manpower Division without any notice to Plaintiff.

**46.**

In March 2014, Haasl also reassigned two (2) other employees, Betty L. Cavalier and Hatsue Morishima, from the Budget Division without notice to Plaintiff.

**47.**

After Haasl reassigned the three (3) employees, the Budget Division was short five (5) employees, which made it difficult for Plaintiff to perform her job duties and increased Plaintiff's workload.

**48.**

In her sworn declaration, David stated that no other section/division besides

the Budget Division was impacted by employees moving to other sections.

**49.**

During the Agency's investigation, David stated that she believed Haasl's behavior towards Plaintiff was motivated by Plaintiff's gender and race.

**50.**

According to Vickers, Civilian Personnel Director, Haasl failed to complete the required personnel action forms for the G-8 unit prior to the reassignments.

**51.**

On or about March 20, 2014, Plaintiff initiated a complaint with the Agency's Inspector General (IG) complaining that Haasl had subjected her to a hostile work environment, harassment, demeaning, and disparate treatment.

**52.**

On or about March 21, 2014, COL Kenneth Kelley ("COL Kelley"), Command Inspector General, informed COL Chase that Plaintiff had filed an IG Complaint.

**53.**

After filing an IG complaint against Haasl, on or about March 25, 2014, Plaintiff learned from Tetsuo Noguchi ("Noguchi") (Asian/Male/No Religion), Administrative Specialist, Local National (MLC-1-5), that Haasl had tasked him

with acting as a "babysitter," for Plaintiff by regularly checking on Plaintiff and monitoring Plaintiff's daily activities during the work day.

**54.**

In his sworn declaration, Noguchi stated that "it was very strange" that Haasl had asked him to keep track of Plaintiff in the office since Haasl only had him monitor Plaintiff.

**55.**

In her sworn declaration, David stated that Haasl was fixated with Plaintiff because of Plaintiff's race and sex.

**56.**

On that same day, on or about March 25, 2014, Plaintiff observed Vickers with a file in his hand when he stopped by her office while on his way to meet with Haasl.

**57.**

According to Plaintiff, on or about March 25, 2014, Vickers appeared to be in possession of her husband's medical file and shared the information with Haasl because Plaintiff noticed black and red markings on the file that she provided to her previous supervisor when her husband was seeking a sponsorship to Japan in 2012.

**58.**

According to Plaintiff, a few years ago, Vickers had recommended Plaintiff apply for a curtailment of her tour in Japan because the Command could not support her husband's medical conditions.

**59.**

On or about March 28, 2014, Haasl accused Plaintiff of being out of her office all morning and threatened to charge Plaintiff with absent without leave (AWOL) for the time Plaintiff spent with the Inspector General.

**60.**

After Haasl repeatedly inquired about Plaintiff's whereabouts, Plaintiff told Haasl that she had went to the IG's office to speak with Carla Gibson-Majors, Assistant Inspector General, about Haasl, and the IG's office would be in contact with her in the presence of Noguchi.

**61.**

After the March 28, 2014 incident, Haasl stopped all communications with Plaintiff and sought assistance from Plaintiff's subordinate, Motoaki (MLC Employee), regarding the budget along with reassignment of some of Plaintiff's job duties to Motoaki.

**62.**

Haasl also isolated Plaintiff from all budget functions and decisions after Plaintiff filed her IG complaint against Haasl.

**63.**

In her sworn declaration, David opined that Haasl's arrogance and racist behavior never slowed down the entire time she was part of G-8 office.

**64.**

On or about March 28, 2014, COL Kelley sent a Memorandum to the Staff Judge Advocate Office and the Commander providing formal notice to USAR that the Office of Inspector General had received a complaint regarding possible misconduct by Haasl, including Plaintiff's allegations that Haasl harassed, intimidated, and demeaned a subordinate (Foresyth), and referred the matter to the Commander for appropriate action.

**65.**

According to Plaintiff, COL Kelly told her "not to be alarmed," if she saw him with Haasl because he was mentoring Haasl.

**66.**

In March 2014, Plaintiff contacted Carla Gobson-Majors ("Gobson-Majors"), Assistant Inspector General, to express concerns about the investigation

16

of her complaint since there seemed to be a conflict of interest with COL Kelley's position as the IG and mentor to Haasl, but Plaintiff's concerns were ignored.

**67.**

On or about March 31, 2014, COL Chase met with Haasl and Plaintiff with the expectation of resolving some of the conflict and issues, but Haasl and Plaintiff were unable to resolve their differences.

**68.**

The following day, on or about April 1, 2014, Haasl accused Plaintiff of failing to timely provide her with a budget brief, but Plaintiff's emails to Haasl showed that Plaintiff timely sent the information to Haasl on March 14, 2014.

**69.**

On April 1, 2014, Plaintiff told COL Kelley and Majors-Gibson that she did not feel comfortable meeting in a room alone with Haasl.

**70.**

After COL Kelley's attempts failed to resolve the issues between Haasl and Plaintiff, on or about April 3, 2014, COL Chase appointed Paul J. Wegman ("Wegman"), Investigating Officer, pursuant to Army Regulation (AR) 15-6 to conduct an informal investigation into the circumstances surrounding allegations made against Haasl by Plaintiff.

**71.**

One day later, on or about April 4, 2014, Haasl informed Plaintiff that she was no longer the Budget Officer for G-8 unit and would be reassigned to the Labor Cost Sharing Division, effective immediately, and demanded that Plaintiff vacate the premises and return the keys to her office in the presence of Noguchi.

**72.**

Plaintiff told Haasl that she did not intend to give up her keys to the office since she had not applied for the position in Cost Sharing and would not agree to move to a position that she knew nothing about.

**73.**

Haasl threatened to call security if Plaintiff did not hand over her keys.

**74.**

Haasl told Plaintiff that she was relieved from her job and directed Plaintiff to leave the office and building immediately.

**75.**

Haasl also directed Noguchi to immediately call security before Plaintiff could leave the building.

**76.**

Haasl requested that Plaintiff be escorted off the Agency's property by the

Military Police (MP).

**77.**

Plaintiff called the IG's office to report Haasl's behavior and proceeded to gather her things while Haasl followed her around the office until Plaintiff told Haasl not to do so.

**78.**

As Plaintiff was leaving the building, Plaintiff met the MP in the hallway and explained that she would not release her keys or leave the building.

**79.**

The MP agreed to escort Plaintiff to the IG's office to meet with COL Kelley and Gibson-Majors.

**80.**

Plaintiff was embarrassed and humiliated by Haasl's actions.

**81.**

After meeting with COL Kelley and Gibson-Majors, Plaintiff left work and went home.

**82.**

Later that same day, on April 4, 2014, COL Kelley (IG) asked COL Chase to leave a meeting, which was also attended by Haasl, and briefed COL Chase on

the incident between Haasl and Plaintiff.

**83.**

COL Chase called Haasl out of the meeting and verbally counseled Haasl about the incident with Plaintiff, including Haasl's decision to involve security.

**84.**

In a sworn declaration, COL Chase stated that prior to April 4, 2014, he told Haasl that she was required to meet with Vickers, GI Shop, and legal to ensure she followed proper procedures before reassigning any employees, but Haasl ignored COL Chase's directive.

**85.**

Later that afternoon, on April 4, 2014, COL Chase requested to visit with Plaintiff at her home and met with Plaintiff and her husband, Turi Foresyth.

**86.**

COL Chase apologized to Plaintiff for the way Plaintiff was treated by Haasl and told Plaintiff that the Command had failed Plaintiff in resolving Plaintiff's initial complaint against Haasl.

**87.**

COL Chase suggested that Plaintiff take administrative leave from work to allow Plaintiff time to get herself together since Plaintiff became very emotional

during the meeting with COL Chase.

**88.**

Plaintiff took administrative leave from April 7-8, 2014 and scheduled annual leave for the remainder of the week through April 11, 2014.

**89.**

While on leave, on or about April 7, 2014, Plaintiff contacted the Agency's EEO Counselor to file a complaint of discrimination against Commander Boozer, COL Chase, Haasl, and Vickers.

**90.**

Plaintiff feared further humiliation and embarrassment by Haasl when she returned to work.

**91.**

On April 9, 2014, COL Chase directed COL Wegman to investigate whether Haasl had violated Army regulations, and/or policies with respect to allegations that Haasl *(1) failed to treat Plaintiff with dignity, respect, fairness and courtesy; (2) intimidated and demeaned Plaintiff on a continuous basis while performing her supervisory duties; and (3) failed to appropriately handle a reassignment of Plaintiff, which culminated in eventual Military Police (MP) involvement on April 4, 2014, contributed to the escalation of workplace*

*tension or created an adverse effect on office morale, production, or*

*maintenance of proper discipline.*

**92.**

Plaintiff's co-worker, David, provided a written statement on behalf of Plaintiff during the AR 15-6 Investigation stating, Haasl had personally created a hostile work environment within the G-8, specifically referencing Haasl's behavior and actions towards Plaintiff.

**93.**

On or about April 13, 2014, Plaintiff had anxiety about returning to work and sought medical treatment after she broke out in hives.

**94.**

Major Reamer examined Plaintiff at the Zama Clinic and determined that Plaintiff's medical condition was related to stress.

**95.**

Major Reamer prescribed medication for Plaintiff and recommended that Plaintiff speak with someone in mental health.

**96.**

On or about April 14, 2014, Plaintiff consulted with Catherine Jorgensen ("Jorgensen"), who was a psychologist at U.S. Army Japan Medical Command,

about her anxiety due to the incident with Haasl that occurred on April 4, 2014.

**97.**

Jorgensen expressed concern to Plaintiff that the traumatic events leading up to April 4, 2014 incident with Haasl could trigger Plaintiff's 2011 PTSD diagnosis and recommended that Plaintiff speak with COL Chase before Plaintiff returned to a hostile and traumatizing work environment.

**98.**

Linda Salzman ("Salzman"), psychologist who had previously provided counseling services to Plaintiff, participated in Plaintiff's session with Jorgensen.

**99.**

Salzman also recommended that Plaintiff speak with COL Chase before Plaintiff returned to work due to the work environment.

**100.**

On or about April 15, 2014, COL Chase met with Salzman without Plaintiff being present to discuss the events that caused Plaintiff's anxiety.

**101.**

When Plaintiff joined the session with Salzman, COL Chase accused Plaintiff of being a contributing factor to the conflict with Haasl.

**102.**

COL Chase told Plaintiff that Haasl has accused Plaintiff of being insubordinate, disloyal, and disrespectful and relayed that Haasl told him that she called security on April 4, 2014 because Haasl felt threatened by Plaintiff

**103.**

COL Chase admitted to Plaintiff that he was not convinced that Haasl actually felt threaten by Plaintiff.

**104.**

Plaintiff denied that she ever was insubordinate, disloyal, disrespectful or threatened Haasl and reminded COL Chase that she reported the issues with Haasl before it was escalated, but COL Chase failed to adequately address Plaintiff's concerns.

**105.**

On April 21, 2014, COL Wegman issued his findings and recommendations concluding the AR 15-6 investigation showed that Haasl had failed to treat Plaintiff with dignity, respect, fairness, and courtesy and had instead routinely treated Plaintiff in a discourteous and disrespectful manner.

**106.**

COL Wegman found that although Haasl's discourteous and disrespectful

conduct was not limited to Plaintiff, Haasl had clearly treated Plaintiff differently from the other three division chiefs.

**107.**

COL Wegman also noted that Plaintiff made several attempts to resolve the conflict without success.

**108.**

COL Wegman further concluded that Haasl continually harassed, intimidated, and demeaned Plaintiff while performing her supervisory duties, which included publicly humiliating language and treatment, emails and phone calls, demands for Plaintiff's immediate presence in Haasl's office, refusing to act on leave requests, and transferring Plaintiff's subordinates (Aaron Okoro, Betty Cavalier, and Hatsue Morishima) to other G-8 divisions without Plaintiff's knowledge or consent.

**109.**

COL Wegman asserted that Haasl's poor treatment of Plaintiff culminated on April 4, 2014, when Haasl improperly attempted to relieve Plaintiff as Budget Officer and remove Plaintiff from the G-8 office.

**110.**

In the investigative report, COL Wegman noted that Haasl had directed her

assistant, Noguchi, to call the MPs to confiscate Plaintiff's office key.

**111.**

COL Wegman added that although Haasl denied telling the MPs to take Plaintiff's office key, MPs confirmed that this was the nature of the call.

**112.**

COL Wegman explained that while Haasl asserted that she had feared for her safety, neither of the two calls Noguchi made indicated any concern other than the confiscation of Plaintiff's office key.

**113.**

COL Wegman concluded that Haasl's April 4, 2014 actions humiliated Plaintiff and seriously and adversely affected the morale in the G-8 Directorate.

**114.**

COL Wegman recommended that management suspend Haasl for five (5) days, counsel Haasl on the appropriate manner of coaching and counseling civilian employees, retain Plaintiff as a G-8 Budget Director, and return Cavalier and Morishima to the Budget Division.

**115.**

COL Chase approved the AR 15-6 investigative findings with a modification related to the findings concerning Haasl's improper attempts to

remove Plaintiff as Budget Officer by instead concluding that Haasl attempted to
reassign duties to Plaintiff from Budget Officer duties, and remove Plaintiff from
her office

**116.**

On or about April 28, 2014, Haasl sent Plaintiff a *Notice of Counseling* in
the form of a meeting request titled, "Counseling for Budget Supervisor," wherein
Haasl counseled Plaintiff about the expectations of her job.

**117.**

Prior to meeting with Haasl, Plaintiff emailed COL Chase to notify him of
the meeting with Haasl to discuss the counseling.

**118.**

When Plaintiff asked Haasl to clarify the purpose of the counseling and
requested to record the conversation, Haasl told Plaintiff that the meeting was not a
counseling but a discussion about the expectations of her job.

**119.**

On May 9, 2014, COL Chase issued a Corrected Notice of Proposed
Suspension in which he proposed suspending Haasl for three (3) days although
COL Wegman and legal had recommended a 5-day suspension and curtailing
Haasl's overseas tour based on the AR 15-6 Investigation findings that her

treatment of subordinates created a hostile work environment within G-8.

**120.**

COL Chase stated that the specific reason for the proposed action was that Haasl had routinely treated Plaintiff and other subordinates in a discourteous and disrespectful manner, which culminated in the April 4, 2014 confrontation and attempt to reassign the Plaintiff from her Budget Officer duties, and to move her from her office.

**121.**

On May 9, 2014, Haasl provided a written response to the Notice of Proposed Suspension denying that she engaged in any misconduct and requested to curtail her overseas tour by May 17, 2014.

**122.**

In a Memorandum dated May 9, 2014, Major General (MG) Boozer approved Haasl's request for curtailment of her overseas tour in Japan.

**123.**

Thereafter, in a Notice of Decision dated May 15, 2014, MG Boozer concluded that the reasons COL Chase cited in the proposed suspension were fully supported by the evidence and warranted a three-day suspension for Haasl.

**124.**

Nevertheless, MG Boozer later determined that a Letter of Reprimand was the minimum disciplinary action necessary to correct Haasl's misconduct and promote the efficiency of the service.

**125.**

MG Boozer did not provide any aggravating and mitigating factors even though he concluded that Haasl routinely treated more than one subordinate in a discourteous and disrespectful manner and that this was Haasl's initial assignment as a supervisor.

**126.**

Approximately two (2) months later, on or about July 22, 2014, Richard Heyward ("Heyward"), Deputy Commander, confronted Plaintiff in a secured area and asked her why she had a chip on her shoulder.

**127.**

When Plaintiff explained to COL Heyward that she had nothing to discuss with him outside of the budget, COL Heyward told Plaintiff to just remember that he was going to be around, which Plaintiff perceived as a threat.

**128.**

According to Plaintiff, COL Heyward questioned her about his part in her

EEO Complaint due to his personal friendship with Haasl.

**129.**

Plaintiff also recalled that her co-worker, Nicholas Patrick Charles ("Charles") (African-American/Asian/Catholic), Deputy to the G-3 (US Army Japan), had previously told Plaintiff that COL Heyward was going to confront Plaintiff since COL Heyward had expressed concern to Charles that Plaintiff appeared to ignore COL Heyward.

**130.**

Approximately one month later, on August 20, 2014, Charles asked Plaintiff what was going on with her complaint since COL Heyward had asked him if he knew anything about Plaintiff's EEO Case.

**131.**

In a sworn declaration, Charles explained that he asked Plaintiff about her EEO complaint after she informed him that COL Heyward has been added to her complaint.

**132.**

However, Charles acknowledged that he had already learned about Plaintiff's EEO activity through COL Heyward and discussions throughout the community.

**133.**

According to Plaintiff, on or about August 22, 2014, COL Heyward publicly commented that Plaintiff was making a "hostile work environment," allegation to him after Plaintiff joked with an MP about giving out tickets during a budget meeting.

**134.**

In his sworn declaration, COL Heyward admitted that he jokingly made the comment about a hostile work environment in the presence of COL Chase, COL Wegman, Todd Eddy, and Plaintiff.

**135.**

The following month, on or about September 2, 2014, Plaintiff learned that COL Heyward had reviewed and approved of Plaintiff's leave request before becoming the Deputy Commander even though her supervisor at the time, Todd Eddy, was available to approve of her leave request.

**136.**

According to Plaintiff, COL Heyward intended to intimidate her by reviewing her leave request to let Plaintiff know that he was in charge.

**137.**

COL Heyward later conceded that he approved of Plaintiff's leave request

instead of allowing her immediate supervisor to do so when provided with the documentation during the course of the EEO investigation.

**138.**

On September 5, 2014, Plaintiff amended her EEO Complaint against the Agency to include additional claims of discrimination, harassment, and reprisal.

**139.**

On September 16, 2014, the IG's office released a redacted report to the EEO investigator concluding that Haasl harassed, disrespected, and demeaned Plaintiff during the performance of her job duties in violation of the Agency's regulations based on the investigative findings of the AR 15-6 investigation.

**140.**

Subsequently Plaintiff requested a final Agency Decision ("FAD") based on the Agency's investigative file.

**141.**

On June 2, 2017, the Agency issued a FAD dismissing Plaintiff's claims of discrimination, harassment, and retaliation.

**142.**

On July 3, 2017, Plaintiff timely filed an appeal of the FAD with the Equal Employment Opportunity Commission (EEOC), Office of Federal Operations

(OFO).

## 143.

On or about February 5, 2019, EEOC's OFO issued a decision denying Plaintiff's appeal and provided Plaintiff with a Statement of Rights, including the right to file a civil action.

## 144.

Plaintiff timely commenced this action within ninety (90) days of receipt of the decision by OFO.

## COUNT I – DISCRIMINATION (TITLE VII)

## 145.

Plaintiff incorporates by reference paragraphs 1 through 144.

## 146.

Plaintiff is an African-American, Female, and Christian, which are protected classes under Title VII.

## 147.

Between March 2014 and September 2014, Defendant, through its supervisory personnel, repeatedly subjected Plaintiff to different terms and

conditions of employment based on her race, sex, religion, and color with regard to work assignments, communications, and supervision.

**148.**

Defendant, specifically Deputy Chief (Haasl), did not subject the other division chiefs to same terms and conditions of employment as Plaintiff and treated similarly-situated employees outside of Plaintiff's protected classes more favorable than Plaintiff.

**149.**

Defendant, specifically Deputy Chief (Haasl), made racially derogatory and/or demeaning comments to Plaintiff about her place in the organization during the relevant time period of Plaintiff's complaint.

**150.**

Defendant, specifically the Deputy Commander (COL Chase) used Plaintiff's religious beliefs and a bible scripture, which referenced slaves and masters, to suggest that Plaintiff obey her supervisors despite being subjected to discriminatory treatment.

**151.**

Defendant not only failed to take the appropriate corrective action to address Plaintiff's complaints, but continued to engage in discriminatory behavior.

**152.**

Plaintiff suffered an adverse employment action(s) as result of Defendant's discriminatory behavior, including significant changes in Plaintiff's job responsibilities, which negatively impacted Plaintiff's ability to perform her job.

**153.**

Defendant's intentional acts of discrimination against Plaintiff proximately and legally caused Plaintiff to suffer harm and damages, including, but not limited to, tangible employment action(s).

**154.**

As a result of the Defendant's discriminatory behavior, Plaintiff is entitled to an award for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary damages.

## COUNT II – HARASSMENT/HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

**155.**

Plaintiff incorporates herein by reference paragraphs 1 through 154 of this Complaint.

**156.**

Defendant's employees repeatedly subjected Plaintiff to unwelcome harassment regarding the terms and conditions of her employment.

**157.**

Defendant, through its supervisory agents, took the following actions to harassment Plaintiff and/or create a hostile work environment: (1) unfairly scrutinized Plaintiff's work performance; (2) prevented Plaintiff from communicating with principal staff in her command; (3) increased Plaintiff's workload due to the reassignment of three (3) members of Plaintiff's staff; (4) interfered with the performance of Plaintiff's job duties; (5) threatened Plaintiff with AWOL for a meeting with the Inspector General; (6) attempted to remove Plaintiff's from her position; and (7) directed the Agency's security/MP to escort Plaintiff out of the workplace, without any justification, which negatively affected Plaintiff's health resulting in Plaintiff taking time off from work to seek counseling and prematurely leave her assignment in Japan.

**158.**

Plaintiff's supervisors engaged in demeaning and hostile conduct towards Plaintiff during the course of her employment with Defendant.

**159.**

Similarly-situated individuals who had not engaged in protected activity were not treated the same by Defendant.

**160.**

Defendant's harassing behavior towards Plaintiff was so severe and pervasive that it altered the terms and conditions of Plaintiff's employment and created a discriminatory and abusive working environment, which caused Plaintiff to take leave from work and ultimately leave her job.

**161.**

Plaintiff repeatedly complained to Defendant about the harassment and/or hostile work environment, but Plaintiff's complaints were largely ignored.

**162.**

After an investigation, Defendant's Office of Inspector General, concluded that Plaintiff's supervisor (Haasl) continually harassed, intimidated, and demeaned Plaintiff.

**163.**

However, Defendant failed to take the appropriate corrective action as required by Title VII, including properly disciplining the charged official(s) and preventing further harassment of Plaintiff.

**164.**

As a result of Defendant's unlawful actions, Plaintiff is entitled to monetary and non-monetary damages for severe emotional distress, mental anguish, humiliation, and her economic losses.

## COUNT III – RETALIATION (Title VII)

**165.**

Plaintiff incorporates herein by reference paragraphs 1 through 164 of this Complaint.

**166.**

The facts show as early as March 2014, Plaintiff engaged in EEO activity protected under Title VII by complaining to her supervisors and the Agency's Office of Inspector General about discrimination, harassment, and retaliation.

**167.**

Plaintiff continued to perform her job duties, but Plaintiff endured constant harassment by her supervisor(s).

**168.**

After Plaintiff complained to Defendant, including the Command Staff and Office of Inspector General, Plaintiff suffered tangible adverse employment

actions between March 2014 and September 2014, including being threatened with AWOL for time that Plaintiff spent with the Inspector General, attempted removal of Plaintiff from her position, escorted from Budget office by Security/MP, and unfairly counseled Plaintiff about the expectations of her job.

**169.**

Defendant's unlawful actions, by and through their employees, constitute retaliation in violation of Title VII.

**170.**

Accordingly, Plaintiff is entitled to an award for future pecuniary losses, emotional pain and suffering, mental anguish, loss of enjoyment of life, and other non-pecuniary damages for the Defendant's intentional acts of discrimination and retaliation.

## COUNT IV – DISABILITY DISCRIMINATION IN VIOLATION OF THE REHABILITATION ACT

**171.**

Plaintiff incorporates herein by reference paragraphs 1 through 170 of this Complaint.

**172.**

Defendant's supervisory personnel, specifically COL Chase, COL Heyward, Haasl, and Vickers, acknowledged during the Agency's investigation that Plaintiff's husband appeared to be physically disabled.

**173.**

The facts also appear to show that the Agency's Personnel Director (Vickers) maintained possession of Plaintiff's husband medical file that Plaintiff had provided to her previous supervisor when Plaintiff's husband was seeking a sponsorship to Japan in 2012 and shared Plaintiff's husband medical history with Plaintiff's new supervisor (Haasl) in March 2014 during the relevant time period of Plaintiff's complaint.

**174.**

The Agency's Personnel Director had also recommended that Plaintiff apply for a curtailment of her tour in Japan because the Command could not support her husband's medical conditions.

**175.**

Defendant's supervisory personnel appears to have considered Plaintiff's husband medical condition when making decisions about the terms and conditions of Plaintiff's employment, including the attempted reassignment of Plaintiff.

**176.**

By its conduct, Defendant engaged in unlawful employment practices and discriminated against Plaintiff based on her husband's disability in violation of 29 U.S.C. § 791 et seq.

**177.**

Defendant's willful conduct sought to intentionally harm and deprive Plaintiff of her rights afforded by the Rehabilitation Act.

**178.**

As a result of the Defendant's unlawful actions, Plaintiff has suffered extreme harm, including, but not limited to, humiliation, embarrassment, and mental distress.

**179.**

## PRAYER FOR RELIEF

**WHEREFORE**, as a result of the violations by the Defendant, Plaintiff respectfully invokes the remedial powers of this Court as provided by Title VII and the Rehabilitation Act and demands the following relief:

    A.    Judgment be entered against the Defendant;

    B.    Trial by jury;

C.      General, compensatory, liquidated, and actual damages;

D.      All other damages allowed by law;

E.      Declare the Defendant's conduct complained of herein to be in violation of the Plaintiff's rights as secured by Title VII and the Rehabilitation Act;

F.      Permanently enjoined the Defendant from discriminating and retaliating against Plaintiff and all other employees who have complained of conduct that may have violated Title VII and the Rehabilitation Act;

G.      Order Defendant to compensate, reimburse, and make Plaintiff whole for all the benefits she would have received but for Defendant's illegal actions, including, but not limited to, back pay, front pay, medical expenses, other employment benefits, promotions, bonuses, seniority, and interest;

H.      Expunge any adverse employment actions from Plaintiff's personnel records as a result of Defendant's unlawful conduct;

I.      Expenses of litigation, including reasonable attorneys' fees, reasonable expert witness fees, and other costs of litigation; and

J.      Such other and further relief as the Court shall deem just and proper.

This 3rd day of May, 2019.

Respectfully submitted,

/s/ Tameka A. West_____
Tameka A. West

Attorney for Plaintiff
Georgia Bar No. 748995

**THE WEST LEGAL GROUP, P.C.**
7179 Jonesboro Road, Suite 202
Morrow, GA 30260
Phone (678) 216-0305
Facsimile (678) 216-0306
E-mail:  tamekawest@bellsouth.net

Case 1:20-cv-00877-LMB-IDD    Document 1    Filed 05/03/19    Page 44 of 45 PageID# 44

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1D, the undersigned counsel certifies that the foregoing

**COMPLAINT FOR DAMAGES** has been prepared in Times New Roman 14

point in compliance with LR 5.1B.

This 3rd day of May, 2019.

By: /s/Tameka A. West_____
     Tameka A. West
     Attorney for Plaintiff
     Bridgette L. Foresyth
     Georgia Bar No. 748995

**THE WEST LEGAL GROUP, P.C.**
7179 Jonesboro Rd., Ste. 202,
Morrow, GA 30260
Phone (678) 216-0305
Facsimile (678) 216-0306
Email: tamekawest@bellsouth.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **BRIDGETTE L. FORESYTH** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action File No.** |
| | ) | |
| | ) | _____ |
| **v.** | ) | |
| | ) | |
| **DR. MARK T. ESPER, SECRETARY,** | ) | |
| **DEPARTMENT OF THE ARMY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>VERIFICATION</u>

Personally appeared before the undersigned attesting officer duly authorized to administer oaths, _Bridgette L Foresyth_, who after being duly sworn in accordance with law, state under oath, and under penalty of perjury, and of their own personal knowledge that the foregoing VERIFIED COMPLAINT FOR DAMAGES is true and correct.

Further affiant sayeth not.

_Bridgette L Foresyth_
**BRIDGETTE L. FORESYTH**
**SIGNATURE OF PLAINTIFF**

Sworn to and subscribed before me this
_2nd_ day of _May_, 2019.

_Bianna Stephens Frasier_
Notary Public

My Commission Expires:
_November 12, 2022_
[NOTARY SEAL]

