1

```
            UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
                  ALEXANDRIA DIVISION

BRIDGETTE L. FORESYTH,          .   Civil Action No. 1:20CV877
                                .
             Plaintiff,         .
                                .
     vs.                        .   Alexandria, Virginia
                                .   August 13, 2021
CHRISTINE WORMUTH, SECRETARY,   .   9:58 a.m.
DEPARTMENT OF THE ARMY,         .
                                .
             Defendant.         .
                                .
. . . . . . . . . . .

                TRANSCRIPT OF MOTION HEARING
           BEFORE THE HONORABLE LEONIE M. BRINKEMA
               UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

FOR THE PLAINTIFF:            KRISTEN FARR, ESQ.
                              The Spiggle Law Firm PLLC
                              4830 31st Street South
                              Suite A
                              Arlington, VA 22206


FOR THE DEFENDANT:            YURI S. FUCHS, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314


OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
                              U.S. District Court, Third Floor
                              401 Courthouse Square
                              Alexandria, VA 22314
                              (703)299-8595



                       (Pages 1 - 10)



           COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1              P R O C E E D I N G S
2         THE CLERK:  Civil Action 20-877, Bridgette L.
3    Foresyth versus Ryan D. McCarthy.  Would counsel please note
4    their appearances for the record.
5         MS. FARR:  Kristen Farr for the plaintiff.
6         MR. FUCHS:  Assistant United States Attorney Yuri
7    Fuchs on behalf of the defendant, Your Honor.
8         THE COURT:  All right.  Now, this is a case for
9    summary judgment.  There's a full, very extensive record that's
10   been developed in this case.  And again, there are three counts
11   in this complaint.  Count 1 is a case of race and gender-based
12   discrimination; Count 2 is a claim of hostile work environment;
13   and Count 3 is a count of retaliation.
14        This is an unusual case in that we are looking
15   essentially at less than a two-and-a-half-month time frame.  As
16   I understand it, there were no problems in the workplace for
17   Ms. Foresyth until a new supervisor named Haasl, which I think
18   is an ironic name in this case, comes on board.
19        And, you know, I have told my law clerks this year
20   after year, but in Title VII cases, I would say 85 to 90
21   percent of them arise when a new supervisor comes on scene.
22   It's the most amazing thing.  The supervisor may have a
23   personality conflict with the plaintiff or is just doing things
24   so differently, and it creates problems in the workplace.
25        There's no question that Haasl was a very poor

3

1   supervisor.  The problem, though, that I see in this case for
2   the plaintiff thus far is that the obnoxious behavior, the
3   overbearing behavior of that supervisor was not just inflicted
4   on your client but was inflicted on all of the people she was
5   supervising.  I mean, she was -- not only was the supervisor
6   reprimanded, but she was removed from that position, and, you
7   know, this is a position in Japan.
8           So, I mean, she clearly was not the right person to
9   be supervising, and the defendant, as soon as it became aware
10  of these problems, took appropriate action.  So in that
11  respect, you know, the claim that the defendant is somehow, you
12  know, maintaining a racially or gender-hostile environment is,
13  just does not come through in the evidence in this case.
14          The -- I don't believe you've been able to show in
15  the evidence any nonspeculative evidence that the plaintiff's
16  gender, race, or color was at all a factor in the inappropriate
17  behavior of Ms. Haasl.
18          Now, it's also interesting that your client responded
19  to her very, very strongly.  The e-mails that your client sent
20  back to her were, were very strong.  You know, they're quoted
21  extensively in the record.
22          But plaintiff responded within two or three weeks of
23  the new supervisor coming on board:  "I verbally told you that
24  I had an extremely bad headache and was taking sick leave when
25  you came into my office for the second time at exactly 9:24 in

4

1 regards to the latest PBAC SlideDeck and mentioning an
2 afternoon meeting," blah, blah, blah; and then she, you know,
3 is upset: "You sent e-mails at 8:20 and 8:25, which I did not
4 see because I was preparing for and calling into the Budget
5 Officer," and "I had not responded to your e-mail that I had
6 not yet seen."
7       And then she goes on to just, you know, go right
8 after the supervisor. I'm not blaming your client, but she had
9 a very strong reaction which most likely aggravated the
10 situation.
11       But, you know, in terms of evidence of any racial
12 animosity, there's this sort of vague statement about people
13 being in their place, but there's no reference to black or
14 African Americans being in their place. There's no specific
15 reference to someone's gender.
16       So I'm going to give you a chance to tell me where in
17 this voluminous record you are truly able to see any evidence
18 of race or gender-based discrimination on behalf of Ms. Haasl
19 first of all. I know the colonel is the other one who's sort
20 of at issue in this case, but let me know where it is in the
21 record.
22       At the lectern, please.
23       MS. FARR: Before I respond to that, if I could just
24 say something about the agency's reaction? They reprimanded
25 her. As first, they prepared a three-day suspension.

5

1          THE COURT:  I don't -- you should respond to a
2  judge's question.  I understand what they did with Haasl.
3          MS. FARR:  The, the IG's report found that
4  Ms. Foresyth was treated differently than the other division
5  chiefs, and she was the only African-American division chief,
6  and it was -- the comment regarding knowing their place was
7  made in regards to two African-American women.
8          So I think the combination of the different treatment
9  that she gave, yeah, I don't think there's any doubt that she
10 was a horrible supervisor, but it was more targeted towards the
11 plaintiff, a black female, and other black women that worked
12 there.  So I think the race and gender come in in that regard.
13         And then, obviously, with Colonel Chase, you know,
14 discussing when she went to him in an attempt to resolve the
15 issue that she was having with her supervisor, you know, he
16 read her the passage that slaves obey your master, which is --
17         THE COURT:  Well, of course, as you know, I mean,
18 first of all, I think it's totally inappropriate for any
19 supervisor to be talking biblical whatever.  There is a --
20 that's a factual dispute.  The defense claims it was -- the
21 term was "bond servant," and it wasn't even the passage -- as I
22 understand it, A, he didn't read that particular passage, and
23 B, had he done it from that particular Bible, it would say said
24 "bond servant" rather than "slave."
25         That, to me, is not a significantly material

6

1  difference, but it's also the same -- this same person, the
2  colonel, ordered an investigation, and he made -- did he not
3  make the decision as to Haasl?
4          MS. FARR:  Colonel Chase?
5          THE COURT:  Yeah.
6          MS. FARR:  I don't think he made the decision.
7          THE COURT:  Mr. Fuchs, who made the decision to first
8  of all discipline Haasl and then -- I know the discipline was
9  changed, but nevertheless, the ultimate thing is she was
10 removed from that position.
11         MS. FARR:  She, she requested to leave.  She
12 requested curtailment to end her time there.
13         THE COURT:  And they curtailed her.  They didn't keep
14 her.
15         MS. FARR:  Correct.
16         THE COURT:  Whereas your client, obviously, was so
17 valuable to them that they didn't want to curtail her.  That
18 was one of her complaints as well.  Right?
19         MS. FARR:  Yes.
20         THE COURT:  Yeah, all right.
21         Mr. Fuchs?
22         You two change positions for a second.
23         MR. FUCHS:  Yes.  As to your question, Your Honor,
24 Colonel Chase ordered the AR 15-6 investigation that found the
25 allegations as to that Ms. Haasl had treated Ms. Foresyth

1  discourteously, also found that she was a -- generally had
2  issues with other people, specifically Ms. Foresyth, though.
3          And he ordered that on April 2, 2014.  Findings were
4  issued April 21, 2014, and then as a result of the disciplinary
5  measures by the individual that Colonel Chase appointed, he
6  proposed a three-day suspension.
7          THE COURT:  Right.  So it was the colonel who
8  proposed the three-day suspension.
9          MR. FUCHS:  Correct, Your Honor.
10         THE COURT:  Somebody else changed that, correct?
11         MR. FUCHS:  The -- Major General Boozer then changed
12 that to a formal reprimand.  That reprimand went away after a
13 year after Ms. Haasl agreed to curtail her tour.
14         THE COURT:  So my memory is correct that Saunders,
15 who is the one who is the other potential person for whom there
16 might be some sort of a claim, actually took action or
17 recommended action against Haasl.
18         MR. FUCHS:  Colonel Chase, Your Honor, yes.
19         THE COURT:  Colonel Chase, yes.  Okay.
20         Well, I don't think there is sufficient evidence on
21 this record -- and it's a huge record -- of race or gender
22 discrimination in Count 1.  I mean, even if there was a little
23 bit more focus on the plaintiff than on the others, this same
24 type of demeaning behavior, discourteous behavior, was
25 inflicted on everyone, in addition to which the defense has

8

1   argued, and I think they're correct, that there really was no
2   adverse actions that were being taken against Ms. Foresyth.
3           The fact that some of her duties were being
4   reassigned and the fact that Haasl had recommended or had
5   proposed that her position be changed, it never went through.
6   She remained in the head position that she had, and some of the
7   duties being reassigned by her underlings is just not the kind
8   of conduct that without more creates a claim of, you know,
9   discriminatory behavior.  So I don't, I don't see the evidence
10  here at all getting past a prima facie case.
11          The same problem exists, I think, with the
12  constructive discharge claim.  First of all, the conduct with
13  Haasl finishes almost a year before the plaintiff leaves the
14  facility.  There's evidence that she had a home in Atlanta,
15  Georgia; that when she did leave, she went to a higher-paying
16  position with the CDC in Atlanta; and how one claims
17  constructive discharge when, in fact, it was the plaintiff who
18  wanted to leave Japan, and she, if anything, was upset about
19  the fact that they didn't want to let her go, and that's what
20  she was fussing with for a while.  So I don't see any evidence
21  that would support a constructive discharge claim.
22          And the other claim that we've got in this case of a
23  hostile work environment, we have at best Haasl's two comments
24  about the employees not knowing their place.  I mean, again,
25  she doesn't say black employees or female employees or black

1    female employees don't know their place.
2            My understanding is, too, that the plaintiff didn't
3    actually hear that comment or it wasn't directed at her.
4            MR. FUCHS:  It was not directed at her, Your Honor.
5            THE COURT:  Yeah, not directed at her.
6            And then there's the colonel's one statement about,
7    whether it was slave or bond servant; but those are the only
8    acts; and one or two, even if they're inappropriate or acts of
9    that sort, are not enough to create a hostile environment.  So
10   I don't find that there's sufficient evidence to show that
11   there was a severe or pervasive racial or gender-based conduct
12   or comments that would support a hostile work environment.
13           And in terms of retaliation, there's just no evidence
14   in this record that any adverse action was taken against the
15   plaintiff after she started raising concerns with the IG's
16   office about Haasl's conduct.  There's first of all no evidence
17   that Haasl knew about the very first contact, and after Haasl
18   did know, again, there's no evidence of any actual action that
19   Haasl took that would, that would go up to the level of an
20   adverse action.
21           The plaintiff remained the head throughout this whole
22   time period of her agency.  There was no diminution of her
23   salary.  I think she did get an actual increase --
24           MR. FUCHS:  Yes, Your Honor.
25           THE COURT:  -- in the time period afterwards, and so

1  it's just not there.

2       So I am going to grant summary judgment.  There's an
3  extensive factual record here, and I don't find on the facts
4  that are in this record that any reasonable juror could find on
5  any of the three claims in the complaint.  So the motion is
6  granted.

7       MR. FUCHS:  Thank you, Your Honor.

8       THE COURT:  That concludes the docket.  We'll
9  reconvene court at 11:00.

10                  (Which were all the proceedings
11                  had at this time.)

12

13            CERTIFICATE OF THE REPORTER

14     I certify that the foregoing is a correct transcript of
15  the record of proceedings in the above-entitled matter.

16

17

18                              /s/
                          Anneliese J. Thomson
19

20

21

22

23

24

25